UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| BRAINSTORM XX, LLC<br>d/b/a WWW.ROBOCALLS.CASH,<br>and<br>LEE "DOC" COMPTON<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>JOHN DOE 1, a/k/a PETER<br>BERGMAN, a/k/a JOSH KING,<br>individually and/or d/b/a<br>ROBOCALLSCASH.NET, and<br>ROBOCALLSCASHKIT.COM;<br>ROBOCALLSCASH.NET, an entity<br>using an assumed name;<br>ROBOCALLSCASHKIT.COM, an<br>entity using an assumed name; and<br>JOHN DOES 2-9; and<br>JANE DOES 1-9,<br><br>　　　　Defendants. | §§§§§§§§§§§§§§§§§§§§§§ | CIVIL ACTION NO. 4:20-cv-554 |

**PLAINTIFFS BRAINSTORM XX, LLC and LEE "DOC" COMPTON'S COMPLAINT FOR EQUITABLE AND MONETARY RELIEF**

Plaintiffs BRAINSTORM XX, LLC, d/b/a www.robocalls.cash, and Lee "Doc" Compton, by their attorneys, file this complaint against Defendants, alleging as follows:

**JURISDICTION AND VENUE**

1.　This action arises under the Lanham Trademark Act 15 U.S.C. §§ 1051 *et. seq.* (the "Lanham Act"). Accordingly, this Court has federal question jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1221 and 28 U.S.C. §§ 1338(a), (b). This Court has supplemental jurisdiction over Plaintiff's state-law based claim of Invasion of Privacy-Appropriations. Venue in this district is proper under 28 U.S.C. § 1391(b)(2) and (3).

**PLAINTIFF'S COMPLAINT FOR EQUITABLE AND MONETARY RELIEF - PAGE 1**

## PARTIES

2. Plaintiff BRAINSTORM XX, LLC, also d/b/a www.robocalls.cash ("Brainstorm") is a Texas corporation with its principal place of business in McKinney, Texas.

3. Plaintiff Lee "Doc" Compton (Compton) is the sole shareholder and principal agent of Brainstorm. Unless otherwise noted where needed, for this pleading Compton was always acting on behalf of Brainstorm or its predecessors and Brainstorm was acting through the acts of its agent Compton and principal, Compton. Accordingly, Brainstorm and Compton will be referred to jointly as "Plaintiff" unless a separate identification is legally or factually necessary.

4. Defendant John Doe 1, a/k/a Peter Bergman, is sued herein under what is assumed, upon information and belief, to be an alias. This complaint will be amended when his true name and capacity are ascertained, if it is different from Peter Bergman. On information and belief, Defendant John Doe 1, a/k/a Peter Bergman, does business through the websites Robocallscash.net and/or Robocallscashkit.com, either as the sole proprietor or as owner of these websites as owner of these websites as separate legal entities. Robocallscash.net and/or Robocallscashkit.com markets to consumers throughout the United States, including the Eastern District of Texas. Upon information and belief, this Defendant will be present in and about the Eastern District of Texas in connection with the claims asserted below or will be subject to the jurisdiction of this Court.

5. Defendants Robocallscash.net and Robocallscashkit.com sell products to consumers throughout the United States as indicated below, through its owners, agents, servants and/or employees. Pursuant to the Federal Rules of Civil Procedure at Rule 17(b)(3), 17(b)(3)(A), and the Texas Rules of Civil Procedure at Rule 28, Plaintiff sues these websites via their assumed names, that being their web addresses. Defendants Robocallscash.net and Robocallscashkit.com are/or will be present in and about the Eastern District of Texas in connection with the claims

**PLAINTIFF'S COMPLAINT FOR EQUITABLE AND MONETARY RELIEF - PAGE 2**

asserted below or will be subject to the jurisdiction of this Court. This complaint will be amended when the corporate identity, whether sole proprietorship, partnership, incorporation, or otherwise, of Robocallscash.net and Robocallscashkit.com are ascertained.

6. Defendants John Does 2-9, and Jane Does 1-9, are unknown Defendants, if any, that may possess ownership interest in and control of the entities that control Robocallscash.net and/or Robocallscashkit.com or may be the sole proprietors of Robocallscash.net and Robocallscashkit.com. Plaintiff will amend this Complaint, as permitted by the Federal Rules of Civil Procedure if any of the John Doe or Jane Doe Defendants are identified.

7. Due to the unknown nature of the actions and identities of the Defendants, Plaintiff will refer to all Defendants collectively as "Defendants."

## THE BACKGROUND OF THE ACTION

8. Compton is a consumer credit expert with twenty-five-plus (25+) years of experience. In 2013, after deciding to shift careers to consumer advocacy, Compton went to work for a law firm to manage and operate the non-attorney functions of its consumer credit section. Among other duties, Compton served as an intake coordinator and was responsible for identifying potential cases of consumer abuse by creditors and debt collectors. Many times, those debt collectors and creditors would contact the firm's clients using autodialers to collect alleged debts. Very often, as Compton learned through his study of the Telephone Consumer Protection Act, those calls were made illegally.

9. Compton left his position with that law firm in 2016 and began working from home on multiple projects. During the summer of 2018, Compton was constantly interrupted by telephone calls from telemarketers attempting to sell him a wide array of products and services. At one point, Compton was getting anywhere from 10 to 20 calls per day. Knowing that these calls

were illegal, Compton researched those companies and identified who they were, drafted pre-litigation demand letters and sent them to the companies that were illegally calling him.

10. Compton's first few tries proved successful. It wasn't long before friends began to ask him how he was making the robocallers pay. Compton inquired on social media about interest in a group focused on stopping the illegal robo-callers and making them pay for their wanton disrespect of the law. Compton was able to quickly assemble a group of approximately fifty (50) people on Facebook who were as frustrated with the incessant and illegal telemarketing calls that violate the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*, among others. (TCPA)

11. That group would answer the telemarketing calls they were receiving, collect information from the callers, and then identify the illegal robocallers. Members were then able to have the identity information needed to effectively send cease and desist letters that demanded payment of the TCPA's civil penalties. People who sent the cease and desist demand letters started seeing a reduction in illegal collecting relatively sizable checks, ranging from hundreds of dollars to thousands of dollars. More importantly, these same people also saw a reduction in illegal robocalls, presumably because their numbers were being highlighted within the robocalls industry.

12. Using the data collected through that private group on Facebook and through his own experiences, Compton developed the "Turning Robocalls Into Cash" kit.

13. The kit details the practical steps that even non-lawyers can take to stop receiving robocalls by enforcing their rights under the TCPA.

14. The kit was eventually released for sale as a thirty (30) page PDF download and sold online for $47.00. The kit was originally released in September of 2018. Using nothing but word-of-mouth to promote the kit, sales began to increase steadily, based on little more than the success stories of existing users and the original test group.

**PLAINTIFF'S COMPLAINT FOR EQUITABLE AND MONETARY RELIEF - PAGE 4**

15. In January of 2018, Compton reached out via social media to consumer reporter Steve Noviello at Fox 4 News in Dallas, Texas. Mr. Noviello used the kit himself and proceeded to collect $5,750.00 in a little under two (2) weeks. At that point, he decided to do a feature story on Fox 4 about the kit. That original story, which has since won an Emmy Award, went viral the night the story first aired and continued to do so the following day, when Noviello presented the same story in ten (10) other major markets around the country.

16. From that time on, Plaintiff contends that consumer demand and media interest have continued to increase. Acting as Plaintiff's CEO, Compton regularly handles press requests from television media, radio stations, and print media. The kit has been featured in news stories from coast to coast on all the major networks, during which segments Compton has been featured as its author and creator. Additionally, Compton has appeared as a guest on a number of live videos via social media and/or live broadcast.

## DEFENDANTS' UNLAWFUL CONDUCT

17. On or about July 10, 2018, a customer on Facebook was attempting to enter the private, members-only group on Facebook that Plaintiff created for users of the kit. After arguing that he had purchased the kit and was thus entitled to entry, Plaintiff told the individual that he had no record of said purchase. Plaintiff asked the consumer to forward his purchase receipt, whereupon the consumer sent Plaintiff a receipt for $17 for a purchase he made via PayPal. Plaintiff does not sell any kit for $17 and does not PayPal for his business. Plaintiff then realized there was a website remarkably similar to his own with a kit designed to imitate his, in a clear attempt to obtain purchases of a copycat kit and thereby capitalize on the media buzz and viral success created by Plaintiff and his kit.

18.     Upon further investigation, and with help from that consumer, Plaintiff found the website in question. The name of that site was Robocallscash.net. It was first registered on or about April 6, 2019, about three (3) weeks after the Noviello piece went viral. Among the first things Plaintiff noticed was that the imposter website was using the local Fox 4 news story about Compton and the authentic kit on YouTube and had placed this video on its website to promote the sale of the kit it offered. This news story contains the face, image and likeness of Compton acting as Plaintiff's CEO.

19.     Plaintiff purchased the copycat kit offered on the imposter website to obtain and read it. It was roughly one-tenth (1/10) the size of the authentic kit sold by Plaintiff and was woefully short on information compared to Plaintiff's kit. Plaintiff contacted the owner of the copycat website via email and, through a contact page on the website. Plaintiff requested a refund and demanded that the copycat website stop using the news footage, which contained Plaintiff's image and likeness and references to the authentic kit, to sell their own copycat kit. Plaintiff received a response from the owner of the site, who called himself Peter Bergmann (possibly a pseudonym), indicating that he had refunded Plaintiff's money, taken down the video, and suggested that he and Plaintiff potentially work together through some sort of an affiliated relationship. Plaintiff declined to enlist Bergman as an affiliate.

20.     Since that time, the owner of the copycat website has continued to publish a website that is confusing to consumers by having the appearance of the authentic website. Indeed, the copycat website has continued to use news footage with Plaintiff's image and likeness as well as references to Plaintiff's kit on YouTube and on the copycat website, continuing to promote the sale of the copycat kit. Plaintiff again attempted to contact Robocallscash.net, but the contact there

has apparently blocked Plaintiff's email and has not responded to repeated requests through the contact page of the copycat website.

21. Plaintiff recently discovered that, upon information and belief, Defendants have created at least one more such site, Robocallscashkit.com, which was created after Plaintiff's complaint to him. Based on the appearance and content of Robocallscashkit.com, it is believed to have been created and/or controlled by the same person or entity that created and/or controls Robocallscash.net. Robocallscashkit.com was first registered on or about August 22, 2019. That domain seems to have been more widely and aggressively advertised through social media sites and pay-per-click ads.

22. Consumer confusion is manifest by the numerous calls that Plaintiff is receiving that not only signify loss of business but also negatively impact Plaintiff's operations. Consumers are constantly sending emails related to the copycat kit, mistakenly thinking that they purchased the authentic kit when, in fact, they have purchased a copycat kit from one of the imposter websites. Many of those emails are, by nature, complaints. Plaintiff has informed the consumers that they have been duped, should request a refund if they've purchased the kit from an imposter site, and encourages them to instead purchase the original kit offered at Plaintiff's website.

23. Plaintiff contends that many of those who contact it about the copycat kit offered at the imposter websites believe that the $17 price tag is some sort of sale or special. This is likely because the imposter website appears to have "reduced" the price from $47 - the cost of Plaintiff's authentic kit - to $17. Even though the copycat kit has received no media accolades, the copycat websites have also use multiple logos of media outlets and television stations that Compton has appeared on or that have featured the Authentic Kit. These logos confuse consumers who believe they are purchasing the authentic kit because of the referenced videos containing Plaintiff's

likeness and image that has appeared on those same stations. Plaintiff is aware of no media appearances by Defendants related to the copycat kit, nor have the Defendants or the copycat kit been featured in any media releases. Even more, the copycat websites have no links to any media featuring the copycat kit.

24. Plaintiff has taken the steps to alert major broadcast networks that their logos were being illegally used by the imposter websites to promote a product designed to mimic his own. Some of those stations have responded and conducted investigations of their own. It is unclear to Plaintiff if the owner of the copycat websites has responded or what action has been taken by the logos' owners. The only thing Plaintiff has noticed about the imposter sites is periodic changes that include the station/outlet logos being used. Additionally, Plaintiff believes these sites use various other logos to imply security and reputational qualifications that the copycat sites and kit clearly do not have.

25. Plaintiff has an affiliate program for its website. The program's agreement affords affiliates the opportunity to make a commission for sales referred by the affiliate, using a unique URL that is assigned to them when they enroll in the affiliate program. One of Plaintiff's elite affiliates is a pay-per-click expert who became an affiliate almost immediately after the program became available. Performing pay-per-click advertising is the affiliate's full-time job. The affiliate saw an opportunity to use pay-per-click ads to sell the Authentic Kit with his assigned affiliate link. Shortly after he began doing so, in July of 2019, the Affiliate noticed that the copycat website started placing ads designed to look like the copy of Plaintiff's website, clearly mimicking keywords and phrases used in Plaintiff's site and by Plaintiff's affiliate to make pay-per-click sales. The affiliate notified Plaintiff of these copycat pay-per-click ads, and Compton personally performed Internet searches where the copycat advertising appeared. Among the keywords the

**PLAINTIFF'S COMPLAINT FOR EQUITABLE AND MONETARY RELIEF - PAGE 8**

new copycat site uses include the title of the authentic kit, Compton's name, and several combinations of words found within the title and copy of the authentic kit.

26. The new affiliate began seeing an increase in the cost of that advertising almost immediately. Based on his experience and knowledge through actively participating in the pay-per-click advertising field, the affiliate attributes the increase cost exclusively to competition from the copycat website. Through the use of technical techniques and reverse engineering, the affiliate opines that the copycat site is selling one kit for every three that Plaintiff sells through his own website. The affiliate also estimates that the copycat website is garnering somewhere in the vicinity of fifty percent (50%) of the clicks resulting from searches for Plaintiff's kit.

27. The owner of the copycat sites also has at least three (3) YouTube channels that Plaintiff is aware of. Those YouTube channels have posted multiple videos using news clips featuring Plaintiff's authentic kit and Compton's personal image without consent. Some of the videos that the imposters have posted may not include footage of Compton or Plaintiff's authentic kit but have uploaded thumbnails as cover photos for those videos, directly taken from new stories about Mr. Compton and the authentic kit.

28. The emails and complaints Plaintiff receives about this copycat site are increasing in frequency, becoming an almost daily conversation with customers and potential customers alike. They have become a real burden to the efficiency of Plaintiff's own operation. Moreover, it is creating remarkable confusion on the part of consumers, given the deliberate use of Plaintiff's name, kit, and image, all for the purposes of selling a woefully inferior product. It is Plaintiff's sincere belief that, not only are consumers being intentionally and willfully mislead, but that his product and personal brand have suffered measurable damage as a result of the ongoing, nefarious acts of the owner of these sites.

29. As of July 14, 2020, Plaintiff discovered that Defendants have now established a Facebook web page and link Plaintiff's likeness, including news articles that feature Plaintiff and Plaintiff's authentic kit.

30. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), states:

(a) CIVIL ACTION

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

## FIRST CLAIM FOR RELIEF
**(Violation of the Lanham Act)**

31. Plaintiff realleges each allegation set forth in the paragraphs above.

32. By reason of the foregoing, Plaintiff hereby asserts a claim against the Defendants for injunctive and monetary relief pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), with regards to the false designation of origin and false descriptions and representations in commerce of Defendants' Unauthorized Merchandise.

## SEOND CLAIM FOR RELIEF
**(Invasion of Privacy - Appropriation)**

33. Plaintiff realleges each allegation set forth in the paragraphs above.

34.     By reason of the foregoing, Plaintiff hereby asserts a claim against Defendants for Texas common law tort of invasion of privacy through appropriation of the name and likeness of another for Defendants' own pecuniary gain. Despite being told to stop using the name and likeness of the Plaintiff, Defendants continue to confuse consumers for pecuniary gain by using videos, photographs and other items to make consumers believe they are purchasing the Plaintiff's product when they are really purchasing a different product.

**JURY DEMAND**

35.     Although the Plaintiff seeks an equitable injunction, even cases predominantly sounding in equity can sometimes have one or more issues of fact or law suitable for a jury. Accordingly, should the Court find that there are any issues of fact or law suitable for a determination by a jury, the Plaintiff respectfully requests a jury trial.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs Lee "Doc" Compton and BRAINSTORM XX, LLC, d/b/a www.robocalls.cash, seeks relief against Defendant, and all others acting in concert with or on behalf of the Defendant, as follows:

A.     As to All Claims for Relief, that Defendant, his agents, servants, employees, officers, attorneys, successors and assigns, and all persons acting in concert with his, be enjoined in this and all other judicial districts in the United States, preliminarily through an *ex-parte* Temporary Restraining Order and injunction during the course of this litigation, and thereafter, permanently from:

1) manufacturing, distributing, selling, offering for sale, holding for sale, or advertising any products, merchandise or goods bearing the name, trademark, or likeness of the Plaintiff or his produce or any colorable variation or imitation thereof;

2) representing that any products, merchandise or goods manufactured, distributed, sold, held for sale or advertised by them is sponsored or authorized by Plaintiff in this district or in any other district in which Plaintiff seeks to enforce this Court's injunction order; and

3) using the name, image, or likeness of Plaintiff.

B.      That Defendants delivers up for destruction any and all Unauthorized Merchandise, including destruction of all related software, advertisements, digital artwork, and copies of the authentic kit.

C.      Economic damages, and

D.      As to All Claims for Relief, that Plaintiff be awarded its costs, attorneys fees and such other and further relief as the Court deems to be just and proper.

RESPECTFULLY SUBMITTED,

/s/ Eric N. Roberson

---

Eric Roberson
Texas State Bar No. 00792803
Kilgore & Kilgore, PLLC
3109 Carlisle Street
Dallas, TX 75204
214-379-0817 Direct
214.969.9099
214.379.0843 Fax
ENR@KilgoreLaw.com

**PLAINTIFF'S COMPLAINT FOR EQUITABLE AND MONETARY RELIEF - PAGE 12**